Commonwealth, Appellant, *v.* Cohen.

Submitted April 8, 1940.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADT-FELD, PARKER, RHODES and HIRT, JJ.

Edward G. Biester, District Attorney, and Webster Grim, for appellant.

James H. Thompson, for intervenor.

No brief was filed nor appearance made for appellee.

OPINION BY HIRT, J., October 8, 1940:

Defendant, a duly licensed osteopath, was charged with prescribing morphine sulphate, a derivative of opium, in violation of Section 4 of the Anti-Narcotic Act of July 11, 1917, P. L. 758, 35 PS 854. He demurred to the indictment on the ground that the information upon which it was based, named and described him, the defendant, as "Theodore R. Cohen, D. O., a duly licensed osteopathic physician." The lower court sustained the demurrer and quashed the indictment, whereupon the Commonwealth appealed, raising the narrow question whether one duly licensed under the acts of assembly regulating the practice of osteopathy, is a licensed physician excepted from the operation of the Anti-Narcotic Act. Since the ruling was against the Commonwealth on a pure question of law it has the right of appeal. Com. v. Simpson, 310 Pa. 380, 165 A. 498; Com. v. Kolsky, 100 Pa. Superior Ct. 596.

The above Act, after defining the word "drug" to include opium and any compound or derivative of opium, in part provides: 'Section 4. No person shall have in his possession or under his control, or deal in,

dispense, sell, deliver, distribute, prescribe, traffic in, or give away, any of said drugs. This section does not apply, in the regular course of their business, profession, employment, occupation, or duties, to ...... (f) licensed physicians: ......" The Act does not define the term "licensed physicians" nor restrict its application to physicians of any particular school, theory or method. And while the purpose of the statute must be considered, the legislative intention primarily must be gathered from the language of the Act and since there is no doubt or ambiguity, effect must be given to the plain meaning of the words used. *Rodebaugh v. Traction Co.,* 190 Pa. 358, 42 A. 953. Moreover the prohibition of this criminal statute carrying with it a penalty for violation must be strictly construed.

A "physician" is "a person skilled in physic or the art of healing; one duly authorized to treat diseases, especially by medicines": Webster's New International Dict. This is the accepted definition, and while the word is used most frequently to mean a doctor of medicine, yet, in ordinary usage, it connotes the disciples of other schools authorized to treat diseases and is not confined to the members of that one class. In its plain meaning the term "licensed physicians" refers to physicians licensed by the Commonwealth through boards or agencies created by the legislature for the purpose. Certainly the term includes those who are duly licensed to practice medicine, and whether osteopaths, also, are to be included must be determined by a consideration of the Act of March 19, 1909, P. L. 46 as amended June 14, 1923, P. L. 795 and June 5, 1937, P. L. 1649, 63 PS 261, et seq., regulating the practice of osteopathy in Pennsylvania.

The Act of 1923 as amended in 1937 defines osteopathy as "a complete and independent scientific system for the preservation of health and the relief and cure of bodily disorders, embracing a distinct etiology, prophylaxis

and therapeutics applicable to all types and conditions of disease which in its practice deals with the human body as an intricate machine, holding as its foremost fundamental, (a) that the body when in perfect structural alignment will function correctly and health ensue; (b) that disease is the effect of anatomical abnormalities producing physiological discord, ...... that pathogenic bacteria are secondary to the predisposing anatomical cause; and (c) which regards and uses non-drug adjunctive measures as palliatives; (d) embraces obstetrics, ophthalmology, subject, however, to the provisions herein as to surgery, subscribes to sanitation and hygiene, and to surgery when indicated and practiced from an osteopathic viewpoint; (e) employs antiseptics, anaesthetics, and germicides in case of necessity and antidotes in case of poisoning; and (f) opposes the introduction of drugs into the body organism as curative agencies." The Act as amended provides for the licensing of an applicant who has had a general preliminary education equivalent to that provided in a standard four years high school course, and not less than one year of college credits on special subjects and who has received a diploma conferring the degree in osteopathy from a "legally incorporated, reputable osteopathic college of the United States." One duly licensed may practice osteopathy in all its branches, including minor surgery and obstetrics without restriction, as above defined, and as taught in legally incorporated, reputable colleges of osteopathy.

The comparative merits of osteopathy and medicine as scientific systems for the treatment and cure of bodily disorders raises a controversial question in the public mind. That question is not for us to attempt to discuss. For the purposes of this appeal it is enough to say that the legislature has seen fit to recognize osteopathy as "a complete and independent scientific system" and in the various acts of assembly, supra, have

given osteopaths the standing of physicians. The question in this case was correctly decided in the court below. The 1909 Act provides in section 12: *"Osteopathic physicians* shall observe and be subject to all State and municipal regulations relating to the control of contagious diseases, the reporting and certifying of births and deaths, and all matters pertaining to public health, *the same as physicians of other schools,* and such reports shall be accepted by the officers or department to whom the same are made." The title to the 1923 Act creates "a board to examine and *license osteopathic physicians* to practice operative surgery" (Italics supplied), and in no fewer than seven instances in the body of the Act those licensed to practice osteopathy are referred to as "osteopathic physicians." This classification of osteopaths in the very Act which determines their qualifications is conclusive of the question. Licensed "osteopathic physicians" are "licensed physicians" and, as such, are excepted from the prohibition of the Anti-Narcotic Act. As a general term "licensed physicians" comprehends licensed osteopaths. *Waldo v. Poe,* 14 F. 2d 749; *Bandel v. Dept. of Health of New York,* 193 N. Y. 133, 85 N. E. 1067.

This conclusion is not affected by the Statutory Construction Act of May 28, 1937, P. L. 1019, Art. VIII, §101, 46 PS 601 defining a "physician" as "an individual licensed under the laws of this Commonwealth to engage in the practice of medicine and surgery in any or in all of its branches." That Act provides that words and phrases shall have the meaning ascribed to them "unless the context clearly indicates otherwise." Not only the context but the language used by its plain meaning, indicate that the word "physician" in the Acts relating to the practice of osteopathy was not used in that restricted sense.

If this defendant has exceeded the authority in him as an osteopath, as the information tends to indicate,

and by prescribing narcotics has invaded the field of medicine, the indictment should have charged a violation of the Act of June 3, 1911, P. L. 639, 63 PS 401, making it a misdemeanor to practice medicine without a license. *Com. v. Dailey*, 75 Pa. Superior Ct. 510.

Judgment affirmed.

DISSENTING OPINION BY RHODES, J.:

I am unable to agree with the conclusion of the majority in sustaining the demurrer to the indictment against the defendant, who was an osteopath or osteopathic physician charged with prescribing morphine sulphate, a derivative of opium, in violation of section 4 of the Anti-Narcotic Act of July 11, 1917, P. L. 758, 35 PS §854. I agree with the holding in the majority opinion that, since the ruling in the court below was against the Commonwealth on a pure question of law, it had the right of appeal. Therefore, the precise question for determination is whether a licensed osteopath comes within the definition of licensed physician, as used in the Anti-Narcotic Act of 1917, as amended, 35 PS §851 et seq. The merit of the various systems is in no way involved.

I also recognize that effect must generally be given to the plain meaning of words used by the legislature, for there is no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes or intentions. But, in my judgment, the terms "osteopath" and "physician" have, in plain and unambiguous language, been differently defined by the legislature, and the language used does not justify the conclusion that "licensed physicians" comprehends "licensed osteopaths." Under article 8, §101, of the Act of May 28, 1937, P. L. 1019, 46 PS §601, an "osteopath" is defined as: "(80) ...... an individual licensed under the laws of this Commonwealth to practice osteopathy"; an "osteopathic sur-

geon" is defined as: "(81) ...... an individual licensed under the laws of this Commonwealth to practice osteopathy and osteopathic surgery"; and a "physician" is defined as: "(87) ...... an individual licensed under the laws of this Commonwealth to engage in the practice of medicine and surgery in any or in all of its branches." These definitions clearly indicate that "osteopath," "osteopathic surgeon," and "physician" have different meanings, and cannot be interchangeably used.

The Act of April 4, 1929, P. L. 160, §1 et seq., 63 PS §171 et seq., concerns the practice of midwifery. Section 6 of that act, 63 PS §176, excepts from the operation of the act "licensed physician or osteopath." It is significant that the legislature refers to both licensed physician and osteopath, and connected them with the disjunctive "or." See, also, the Act of May 3, 1933, P. L. 242, No. 86, §17, 63 PS §523.

It is also to be noted that there are two distinct acts of assembly governing the practice of osteopathy, and that of medicine and surgery. See 63 PS §261 et seq. and 63 PS §401 et seq. The qualifications of the respective applicants for licensure are very different, and there is no statutory requirement for applicants to practice osteopathy to be examined in materia medica and therapeutics, while there is such statutory requirement for applicants to practice medicine and surgery. See Act of March 19, 1909, P. L. 46, §8, as amended by the Act of May 17, 1917, P. L. 229, §1, 63 PS §262, and the Act of June 3, 1911, P. L. 639, §6, as last amended by the Act of April 20, 1921, P. L. 158, §4, 63 PS §407.

The Act of March 19, 1909, P. L. 46, as amended, 63 PS §261 et seq., which enumerates the rights, privileges, qualifications, and requirements pertaining to the practice of osteopathy, contains no provision which authorizes an osteopath to prescribe or use narcotics. The Act of 1909, as amended by the Act of June 5, 1937,

P. L. 1649, §3, 63 PS §268, does, however, permit osteopathic surgeons to use narcotics in addition to anaesthetics, antiseptics, and germicides permitted to osteopaths. Even here there is no express provision for an osteopathic surgeon to prescribe narcotics. The exclusion of this privilege to osteopaths, and the limited inclusion of the right to osteopathic surgeons is clear and the reason obvious. The extended training and qualifications before an osteopath or osteopathic physician can become licensed as an osteopathic surgeon, and the added privileges which are given as the result of additional training and experience justly and humanely require inclusion of the right to use narcotics.

Section 11 of the Act of March 19, 1909, P. L. 46, as last amended by the Act of June 5, 1937, P. L. 1649, §2, 63 PS §266, contains the following: "Any use or practice by osteopathic physicians ...... shall not be construed the practice of medicine ......" It thus becomes evident that a physician, according to the legislature, is one engaged in the practice of medicine, while an osteopath or osteopathic physician is one engaged in the practice of osteopathy, and whose practice the legislature says shall not be construed the practice of medicine. The fact that the acts of assembly relating to osteopaths used the words "osteopathic physicians" gives no support to the contention that the term "licensed physicians" comprehends "licensed osteopaths," and that they thereby qualify under the term "physicians" in the Anti-Narcotic Act of 1917, P. L. 758, §4 (f), 35 PS §854 (f). The weakness of this conclusion becomes evident when reference is made to the Act of May 5, 1915, P. L. 248, §1, 63 PS §491: "4. 'Veterinarian' includes a veterinary physician, or veterinary surgeon, or veterinary dentist." Using the same analogy as that found in the majority opinion, it would be necessary to conclude that the word "physician" included veterinarian, and that the latter would therefore come under section 4 (f) of the Anti-Narcotic Act of

1917, 35 PS §854. Of course, that was not intended, and is not the fact. See Act of July 11, 1917, P. L. 758, §9, 35 PS §862.

Under the Anti-Narcotic Act of 1917, the legislature specifically includes veterinarians under paragraph (h) of section 4, while licensed physicians are included under paragraph (f) of that section. 35 PS §854. No provision was made for osteopaths or osteopathic physicians. The reason for this omission is most apparent.

Webster's New International Dictionary defines "osteopathy" as: "A system of treatment based on the theory that diseases are chiefly due to deranged mechanism of the bones, nerves, blood vessels, and other tissues, and can be remedied by manipulations of these parts." 30 Words and Phrases, Permanent Edition, page 340, has the following definition: "A method of treating diseases of the human body without the use of drugs, by means of manipulations applied to various nerve centers—chiefly those of the spine—with a view to inducing free circulation of the blood and lymph, and an equal distribution of the nerve forces. Special attention is given to the readjustment of any bones, muscles, or ligaments not in the normal position." Section 11 of the Act of March 19, 1909, P. L. 46, as last amended by the Act of June 5, 1937, P. L. 1649, §2, 63 PS §266, refers to osteopathy as "a complete and independent scientific system ...... (c) which regards and uses nondrug adjunctive measures as palliatives; ...... and (f) opposes the introduction of drugs into the body organism as curative agencies." Obviously, the administration of drugs is not contemplated as within the profession of an osteopath. [1] The Anti-Narcotic Act of 1917, supra, §4, 35

[1] "Osteopathy considers bipedal man and his ailments as primarily a problem of structure. According to osteopathic theory, structural maladjustments, particularly in the region of the spine, are the major factors in disease. For the osteopath, therefore, the most logical therapy is the readjustment of affected parts by

PS §854, states: "This section does not apply, in the regular course of their business, profession, employment, occupation, or duties, to— ...... (f) licensed physicians; ......" An osteopath in the regular course of his profession does not use or administer drugs; he is opposed to such practice. The legislature therefore did not mention an osteopath in any of the exceptions of section 4 of the Anti-Narcotic Act of 1917, supra, 35 PS §854. To me the conclusion is inescapable that the term "licensed physicians" does not comprehend "licensed osteopaths" or "licensed osteopathic physicians"; an osteopath is not a physician as defined by the statute. Cf. *Georgia Ass'n of Osteopathic Physicians & Surgeons, Inc., et al. v. Allen, Collector of Internal Revenue,* 31 F. Supp. 206.

As an osteopath or osteopathic physician has no authority to prescribe narcotics, the demurrer to the indictment should have been overruled.

STADTFELD, J. joins in this dissent.

manipulation. ...... As envisioned by Dr. Still [Andrew Taylor Still, founder of osteopathy], osteopathy was grounded on a concept of human anatomy as a machine that falls prey to disease only through failure of its working parts. Dr. Still, accordingly, considered cure chiefly as a problem of mechanical readjustment. Before his death in 1917 he saw his frontier science brought closer to the main stream of medicine, but his theory of human mechanics still guides the thinking of his successors": *Life,* pp. 51, 54, August 19, 1940.