## Commonwealth *v*. Mills, Appellant.

Argued September 25, 1944. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and HUGHES, JJ.

*Ben H. Giffen,* for appellant.

*Earle R. Jackson,* Assistant District Attorney, with him *Russell H. Adams,* District Attorney, for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, October 31, 1944:

John B. Jones was shot and killed on January 7, 1943, at about 3:00 A. M. The defendant was accused of the crime. After trial he was adjudged guilty of murder in the first degree and sentenced to life imprisonment. Motions were filed in arrest of judgment and for a new trial, both of which were refused. This appeal followed.

The deceased came from Oklahoma into the Pittsburgh area a few days prior to the homicide, and he was employed in the ship building yards of the Dravo Corporation in Allegheny County. Whitney A. Rodrequez, a fellow employee, also came from Oklahoma at about the same time, and he was the witness whose testimony was relied upon by the Commonwealth to sustain the charge of murder.

At 4:30 P. M. on January 6, 1943, Jones and Rodrequez quit work and after going to their rooms, visited a saloon in Coraopolis where they spent some time drink-

480

ing and conversing. Later they boarded a street car and came to Pittsburgh. About an hour later they were in the vicinity of the Greyhound Bus Terminal on Liberty Avenue near the Pennsylvania Railroad Station. They crossed the street and entered a restaurant, attempting unsuccessfully to get something to drink. They then re-crossed the street for the purpose of entering the Greyhound Terminal.

There were three colored men standing outside of the terminal, but the defendant was not identified as one of them. Jones and Rodrequez had an "argument" with these three colored men. This was started when Jones made some slurring remark about "niggers." This argument continued for about five minutes after which Jones and Rodrequez walked up the stairs from the Liberty Avenue entrance of the terminal and entered the main portion of the bus station. Rodrequez looked at the time in the bus station. It was then 2:20 A. M. Immediately upon their entry a colored man came in from the opposite entrance on Grant Street. Rodrequez claimed that this man was the defendant. The latter motioned for Rodrequez and Jones to come over, and he suggested that he would take them where they could get whiskey. In the company of this colored man, Jones and Rodrequez left through the Grant Street entrance of the terminal and proceeded across a trestle or tunnel, which runs beneath Bigelow Boulevard and leads onto Washington Street, and after traveling some distance on Washington Street, the colored man went into a house while Jones and Rodrequez waited for his return. Upon his return all three continued walking down Washington Street into an alley known as Yuba Way. They proceeded in the alley as far as Voorhees Way, where they stood for about ten minutes, under an arc light, again discussing whiskey. Rodrequez and Jones asked the colored man when they were going to get the whiskey, and he replied that he would go across and "see if everything is clear. If it is, I will wave for you to come." The de-

fendant later motioned for them to come and Jones crossed the alley first, and the instant he and the colored man entered the shadow of the building, Rodrequez, who had started to follow them, heard the firing of shots and heard the colored man say to him, Rodrequez, "Stand where you are." Rodrequez then turned and saw fire coming from the shadow. Rodrequez was hit with a bullet in the arm. He fell over and as he went down another bullet hit him in the leg. Rodrequez "laid there awhile and got up and tried to run" and went across the alley. He went 200 ft. further and fell and remained there for some time and then got up and "crawled or staggered for about six blocks." He then met a policeman and reported to him what had happened. Rodrequez was taken to a hospital. In the hospital some photographs of colored men were shown Rodrequez, and he recognized the picture of one of these men as the colored man he had been with just before the shooting. They then brought in the defendant with another colored man and as soon as Rodrequez saw him he identified him as the colored man he had been with just before the shooting. "He said that he was absolutely positive" that this defendant was the man who said "Stand where you are." At the time the man bade him stand Rodrequez did not see him but he said: "I recognized his voice [1] as the voice that had been talking to us for at least a half hour."

The defendant denied (1) the shooting, (2) his presence at the Greyhound Bus Terminal, and (3) that he had taken Jones and Rodrequez anywhere for any purpose. The defendant has been a resident of Pittsburgh since 1919 and since November, 1941 he has been employed as a bartender at a place of business on Center Avenue in Pittsburgh. The defendant offered in his behalf an alibi. He offered evidence tending to show that

---

[1] Robert Platt, at whose house the defendant roomed and who was an alibi witness, described the defendant's voice as a "heavy" one which "stood out among the other roomers".

on the early morning of January 7 when the homicide took place, he was at home with his wife at their rooming-house. The defendant's employer testified that the defendant came to work on the afternoon before the homicide at about 2 o'clock, and that he "must have" left work on that morning between 1:15 and 1:30 A.M. Defendant's "landlady" said "I couldn't say that he was at home that particular night, but he is home every night." Her husband testified that the defendant customarily got home between 1:30 and 2:00 A.M. Miss Beatrice Jackson, colored, who roomed across the hall from the defendant, testified that she heard the defendant come in on the morning of the homicide "at about quarter of two." The defendant's wife testified that the defendant came to the house where they roomed on the morning of the homicide "at about quarter of two" and that he remained there and went to bed "about twenty minutes to three." These witnesses testified also that they had never seen the defendant with a gun. There were a number of witnesses who testified as to the defendant's good reputation.

The evidence in this case raised an issue of fact which had to be submitted to the jury. The appellant complains of that part of the charge of the court reading as follows:

"I do not know, members of the jury, that there is anything more I can say to you that would be of assistance to you in arriving at your verdict in this case. We have, in addition to the evidence offered in the case, evidence from two witnesses, that this defendant had borne a good reputation. That is substantive evidence. It is evidence of a fact to be considered by you, together with all the other evidence in the case. It is not a mere makeshift. It might have the effect of creating in your mind an honest doubt as to the guilt of the defendant. If it has that effect, it would be sufficient to work an acquittal: but, in connection with the evidence of his previous good reputation, you should also take into consideration as

affecting his credibility, the fact that in 1940 he was found guilty of violating the Firearms Act of this State, and that he had in his possession a weapon, a revolver, which he was not licensed to carry. I say that fact was brought out solely for the purpose of affecting the credibility of the defendant."

Nowhere in the record is there any proof that the defendant had ever been found guilty of the law violation stated or that he had in his possession a revolver.

On cross-examination the defendant said he had not owned a gun since 1940. That gun was "a little 25 automatic." The trial judge in his opinion overruling defendant's motions in arrest of judgment and for a new trial admitted that his statement about the defendant having been found guilty of violating the Firearms Act "was an inadvertance," but averred that the violation was "a fact, although it was not in evidence." The trial judge's statement to the jury was of a fact extremely prejudicial and for which there was no testimonial warrant. Therefore, it is reversible error.

Appellant also complains of the following charge of the court as to his alibi:

"The defense in this case is what is known in the law as an alibi: translated that means 'other place.' The defendant claims that he could not possibly have committed this crime because he was some place else when the crime took place. Now, if that defense is proven to be true, it is, of course, a perfect defense, because it is physically impossible for a person to be in two different places at one and the same time. The burden of proving an alibi is cast on the defendant, whereas the Commonwealth is required to establish the guilt of a defendant beyond a reasonable doubt, nevertheless, where an affirmative defense is interposed, such as is interposed here, the burden of establishing that is on the defendant, but the degree of proof is not as high as is placed on the Commonwealth. While the Commonwealth is required to establish the guilt of the defendant beyond a reason-

able doubt, all that the defendant is required to do is to establish his alibi by the fair weight or preponderance of the evidence. In other words, the evidence offered by him and his witnesses, in support of his contention that he was at home, in bed, or preparing to go to bed, at the exact time that this shooting took place, must be such, in your minds as fair and reasonable men and women, that it outweighs the evidence produced by the Commonwealth."

The language quoted might easily have led the jury to believe that the evidence offered by the defendant as to his alibi had to, in order to work his acquittal, "outweigh the evidence produced by the Commonwealth" to prove his guilt of murder, though what the trial judge apparently meant was that the evidence *in support of the alibi* must "outweigh" the evidence *against the alibi*. The excerpt quoted was at least ambiguous and had a tendency to mislead the jury. We have said that "a trial judge's charges which are inadequate or not clear, or which tend to mislead are well recognized grounds for reversal." *Sears v. Birbeck*, 321 Pa. 375, 391, 184 A. 6 (citing other cases).

This court has so frequently laid down the correct rule as to the burden of proof in criminal cases in which the defendant sets up an alibi that it is a matter of surprise that all trial judges do not apply it. In *Rudy v. Commonwealth*, 128 Pa. 500, 18 A. 344, Justice STERRETT speaking for this court, said of the charge of the lower court in that case that it "constitutes a full, clear and accurate statement of the law on that subject. The burden of proving it was clearly on the prisoner. If he failed to do so to the satisfaction of the jury, the alleged alibi, as a substantive defence, was valueless; but that did not deprive him of the benefit of his evidence on that subject, so far as it, in connection with other testimony in the case, may have had a tendency to create a reasonable doubt as to his guilt." In *Commonwealth v. Barrish*, 297 Pa. 160, 146 A. 553, this court, in an opinion

by Justice KEPHART, reiterated the rule as to the burden of proof when the defendant sets up an alibi. He pointed out that "the facility with which testimony to support it [an alibi] may be procured from well-meaning or designing persons, their observation as to time and place being often tempered by the fact that the defendant is accused of a crime . . . and the fact that it [an alibi] is a most difficult answer to meet, make it necessary that some rule should be laid down, designed to inform the defendant of the quantity and quality of proof necessary to establish such defense. So we have said, evidence that reasonably satisfies or reasonably preponderates is sufficient. . . . [But] any rule that takes from the evidence of alibi its capacity to raise a reasonable doubt as to the prisoner's guilt would be incorrect, and against the great weight of authority.[2]. . . The Pennsylvania rule recognizes this capacity, though it may seem a trifle incongruous in view of what we have said as to the burden of proof of the alibi. The latter is necessary to properly convey to the jury the judicial experience with certain issues involved in criminal cases. Where one is accused of having committed a crime and from all the proof submitted, including the evidence as to the alleged alibi, a doubt exists in the jury's mind as to whether the accused was at the scene of the homicide at the time of the commission of the crime, this may be enough to warrant acquittal because of a reasonable doubt of guilt." (Citing cases.)

The "incongruity" to which Justice KEPHART refers is most manifest in cases like the one now before us where practically the basic issue for the jury to consider was whether or not the defendant was at the scene of the homicide when it was committed. When this jury was convinced to a moral certainty that the defendant was at the rather isolated scene of this homicide when it was

---

[2] "It is generally conceded that the accused does not have the ultimate burden of proving an alibi": Wigmore on Evidence, Third Edition, Vol. 9, Sec. 2512(c).

committed at about 3 A.M. as the identifying witness "positively" says he was, it probably had but little difficulty in coming to the conclusion that the defendant was guilty. Rodrequez testified that while he did not see the defendant *shooting* "he took us to the scene and he didn't offer to help me after I was down," and that the voice which after Jones was shot and before Rodrequez was shot, commanding him (Rodrequez) to "stand where you are" was the defendant's. The jury had no right to find this defendant guilty as charged unless it was convinced beyond a reasonable doubt that he was at the place stated and at the time stated, and the burden of so convincing the jury remained on the Commonwealth. If the testimony the defendant offered in support of his alibi raised a reasonable doubt in the jurors' minds as to the defendant's presence at the scene of the homicide, he was entitled to an acquittal. Instructions as to the burden resting on a defendant who pleads an alibi are in a case whose facts are so restricted as they are here, of little or no value in helping a jury reach a just verdict. Since the defendant could not have committed this crime unless he was present to commit it, the Commonwealth was not entitled to a verdict of guilty unless it proved beyond a reasonable doubt the defendant's presence at the scene of the crime when it was committed.[3] There *are* homicide cases in which an accused's presence at or near the scene of the crime is only *one* factor, and possibly a minor one, in the jury's problem, and in such a case if the accused sets up an alibi, and the evidence in support of it is overcome by the weight of the Commonwealth's evidence against it or is only evenly balanced with the Commonwealth's evidence, that evidence in support of the alibi becomes valueless to the accused except

---

[3] In a case factually like this one the Commonwealth is not harmed and there is less likelihood of the jury being confused, if the usual instructions as to the burden resting upon the pleader of an alibi are dispensed with.

as it in connection with other testimony in the case may have a tendency to create a reasonable doubt of his guilt.

We adjudge the instruction as to the defense of an alibi misleading and prejudicial.

Appellant further complains of what the trial judge said in answer to a note received from the jury when it returned from the jury room for further instruction. The note read as follows:

"Will you please give us the definition of life imprisonment and the penalty. Is the prisoner eligible for parole at any time?"

The court replied as follows:

"When a prisoner is sentenced to life imprisonment, he is not eligible to be paroled. He may, however, apply to the Pardon Board for a commutation of his sentence. We have, in Pennsylvania, a State Parole Board, which has jurisdiction in all cases except where the penalty is death or life imprisonment, and we also have a Pardon Board, and the Pardon Board is comprised of the Lieutenant Governor of Pennsylvania, the Secretary of the Commonwealth, the Attorney-General and the Secretary of Internal Affairs. Any prisoner, regardless of what the sentence is, may make application to the Board of Pardons for a commutation of his sentence, and the Board may then make its recommendation to the Governor for a reduction of sentence or, if the circumstances, in the opinion of the Pardon Board, warrant, they may recommend a full and complete pardon."

Both the inquiry and the answer were irregular and neither should have been made. The only issue before the jury was that of the guilt of the defendant. Whether if found guilty and sentenced he was then eligible for parole was of no concern to the jury and the trial judge should have said so. The answer of the trial judge was well calculated to lead the jury to believe that if it resolved a reasonable doubt of defendant's guilt against him the Board of Pardons would make a timely correction of its error. Most of our citizens probably are aware

that there is a Board of Pardons in this Commonwealth, but it is no part of a trial judge's duty to instruct jurors on that subject. Such instructions as those now complained of constitute an implied invitation to the jury to transfer to the Board of Pardons an unpleasant responsibility which it is the jury's sworn duty to discharge.

The judgment is reversed and a new trial is ordered.