## Commonwealth *v*. Carey, Appellant.

Argued May 21, 1951. Before DREW, C. J., STERN, STEARNE, JONES, BELL, LADNER and CHIDSEY, JJ.

*Julian W. Barnard,* with him *James N. Peck,* for appellant.

*Bernard E. DiJoseph,* Assistant District Attorney, with him *J. Stroud Weber,* District Attorney, for appellee.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, June 27, 1951:

Ollie Carey was convicted by a jury of murder in the first degree with the penalty fixed at death. Defendant was indicted for the murder of Thomas J. Matthews, a

police officer, who was killed by gun shot wounds while in pursuit of defendant, whom the officer sought to place under arrest. His motion for a new trial having been overruled, defendant appeals from the judgment and sentence.

The reasons assigned by defendant are (1) The evidence does not establish that the killing was committed in the perpetration or attempt to perpetrate burglary or in an attempt to escape therefrom (2) Alleged prejudicial answer by the trial judge to a question propounded by the jury relating to the effect of recommendations by the jury with respect to their proposed verdict and (3) Refusal by the trial judge to affirm defendant's fifth request for point of charge which related to the requisite elements of circumstantial evidence.

Defendant was represented by able trial lawyers appointed by the court. Judge DANNEHOWER fairly and patiently conducted the trial which required four days. The charge to the jury was comprehensive and accurate, and which prompted defendant's counsel to remark: ". . . [the charge] is the finest, the most logical, best expressed Charge I have ever heard delivered to any jury."

The controlling facts are so fully narrated in the charge and in the opinion refusing the new trial that we will not restate them in detail. In summary: defendant, a former convict, on Saturday, June 25, 1949, burglarized the Blizzard home in Rydal, Abington Township, and on Monday, June 27, 1949, burglarized the Hauptfuhrer residence, both being in the same neighborhood; the houses were closed for the summer; he carried away from both homes all the loot which he could pack in two stolen suit cases, and in his pockets; apparently his pockets were filled to overflowing because he lost a watch and cigarette lighter along his

way home, and which were later identified as part of the stolen goods; because defendant was unable to carry away on his person all the property in the burglarized houses he desired to acquire, he segregated and piled in each residence merchandise which he proposed subsequently to pick up with the aid of an automobile. On Tuesday night, June 28th, he stole a truck in Philadelphia for use in removing the loot which he had piled up in the two dwellings which he had previously broken into and burglarized. On the early morning of June 29th, at about 1 a. m., after driving the truck to Rydal, defendant re-entered the Blizzard residence through the door he had left unlocked (after breaking in on June 25th) and picked up in the hall six bottles of liquor which he placed in the back of the truck; he then proceeded in the truck toward the Hauptfuhrer home where the additional articles were left by him to be picked up.

At this time, 1 a. m. June 29th, police officers Clark Cutting and Thomas J. Matthews (the victim) were patrolling the vicinity in a police car; at the adjacent Koenig residence the flood lights were turned on and dogs barking and they proceeded to investigate. While so engaged the police officers heard and saw a truck drive past; they followed in the police car; the truck was observed to enter and then back out of the O'Neill driveway, opposite the Hauptfuhrer residence; the police officers stopped the truck and questioned the driver, the sole occupant, whom officer Cutting identified as the defendant. The liquor was seen in the rear of the truck; while the defendant was being questioned, defendant slid out of the opposite front door of the truck and ran across the Hauptfuhrer lawn and into the woods in the rear; he was closely pursued by both police officers; officer Matthews (the victim) ran after defendant shouting for him to halt and shooting his revolver; at Matthews' request, Cutting returned to the police car

and radioed for help; while Matthews continued the pursuit, still firing his gun, Cutting heard some one fall in the woods; the policemen who responded in answer to the radio call, with the aid of flood lights, discovered the dead body of officer Matthews, on his back, with arms extended, handcuffs near his right hand, and the cartridges in his revolver all discharged. His death was found to have been caused by bullets from a .38 calibre Smith & Wesson revolver (similar to that stolen from the Hauptfuhrer residence); nearby was also found a rubber heel from defendant's sandals. Defendant had escaped. On July 8, 1949, he was arrested in Amherst, Virginia. In a letter to friends in Virginia defendant wrote "You see I killed a policeman." In the Amherst jail he told his cellmate "I'm here for murder, I killed a cop in Pennsylvania." There are many other corroborating circumstances, all of which are narrated in detail by the court below in its charge and opinion, which are cumulative to the overwhelming circumstantial evidence that defendant killed the officer with a deadly weapon while fleeing from a burglary and which also clearly established a wilful, deliberate and premeditated killing.

The learned and experienced trial judge charged the jury fully, accurately and comprehensively. He adequately charged them concerning the elements which constitute murder in the first and second degree when the killing with a deadly weapon is wilful, deliberate and premeditated; he also defined murder committed in the perpetration of burglary and fully instructed the jury concerning measuring and weighing the evidence in connection therewith and their duty in fixing the penalty.

We have reviewed both the law and the evidence, as we are required to do, to determine whether the ingredients necessary to constitute murder in the first degree were proven to exist: Act of February 15, 1870 P. L.

section 2, 19 PS, 1187. Beyond any question of doubt these elements *were* proven to exist.

Under the facts in this case we are relieved from considering whether there were three burglaries or only one. It was conclusively established that on the night of the killing defendant had feloniously re-entered the Blizzard residence, which he had previously burglarized and had left a door unlocked to facilitate his re-entry upon his proposed return to pick up the articles he had piled up for subsequent removal. Defendant on his re-entry of the Blizzard home removed six bottles of liquor which he placed in the truck. This constituted a statutory burglary under section 901 of The Penal Code of June 24, 1939 P. L. 872, 18 PS, 4901. Under the code the offense is burglary to ". . . wilfully and maliciously, [*enter*] any building, with intent to commit any felony therein. . . ." (Italics supplied); *Commonwealth v. Maloney*, 365 Pa. 1, 73 A. 2d 707. Having attempted to reduce the loot to his complete dominion preliminarily by placing it in the truck, defendant commenced to carry it away. He was intercepted by the police officers, and while being questioned fled and was pursued by the officers, resulting in the death of one of them. The killing had an ultimate relation and close connection with the felony: *Commonwealth v. Kelly*, 333 Pa. 280, 4 A. 2d 805. The flight and escape were part of the crime: *Commonwealth v. Lawrence*, 282 Pa. 128, 127 A. 465; *Commonwealth v. Doris*, 287 Pa. 547, 135 A. 313; *Commonwealth v. Kelly*, 337 Pa. 171, 10 A. 2d 431. There was no break in the chain of events between the felony and the killing: *Commonwealth v. Doris*, supra; *Commonwealth v. Dillard, et al.*, 313 Pa. 420, 169 A. 138; *Commonwealth v. Elliott*, 349 Pa. 488, 37 A. 2d 582. All of these questions the trial judge left for the determination by the jury: *Commonwealth v. Kelly*, 333 Pa. 280, 4 A. 2d 805.

But independent of any question whether or not the burglary had been completed because of defendant having placed the liquor in the truck, the killing with a deadly weapon took place while the defendant was fleeing from the police officer who was endeavoring to capture and arrest him.

Defendant complains that there was no testimony that anyone saw him shoot and kill the victim; that no gun was found in his possession and that evidence of the actual killing by defendant was wholly circumstantial and insufficient in quality. He assigns as error the court's refusal of the fifth point of charge that the quality of circumstantial evidence must be "such as to exclude every other reasonable possibility, except that of guilt." The trial judge properly refused to so charge. The true test of the quality of circumstantial evidence necessary to convict has been repeatedly stated by this court. In *Commonwealth v. Bausewine,* 354 Pa. 35, 46 A. 2d 491, the present Chief Justice said, p. 40: "While the mere fact that the evidence adduced is wholly circumstantial is not fatal to the Commonwealth's case (Commonwealth v. DePetro, 350 Pa. 567, 577, 39 A. 2d 838), yet it must be remembered that guilt must be proved and not conjectured. The reasonable inference of guilt must be based on facts and conditions proved; it cannot rest solely on suspicion or surmise. These do not take the place of testimony. The facts and circumstances proved must, in order to warrant a conviction, be such as to establish the guilt of the defendant, not necessarily beyond a moral certainty, nor as being absolutely incompatible with his innocence, but at least beyond a reasonable doubt. The circumstantial evidence in this case is not such 'as reasonably and naturally to justify an inference of the guilt of the accused, . . . and of such volume and quality as to overcome the presumption of innocence and satisfy the jury of the accused's guilt beyond a reasonable doubt':

Commonwealth v. Marino, 142 Pa. Superior Ct. 327, 16 A. 2d 314; Commonwealth v. Libonati, 346 Pa. 504, 508, 31 A. 2d 95; Commonwealth v. Holt, 350 Pa. 375, 387."

The charge correctly stated the law. The evidence was of such quality and quantity to support amply the verdict by the jury. The defendant was seen being pursued by officer Matthews and running into the woods where the body was found. Defendant admits he was attempting to elude arrest. Shots were heard. Defendant's rubber heel was found near the body. The death dealing wounds were inflicted by the type of revolver which defendant had stolen from the Hauptfuhrer home; not only did defendant then flee the jurisdiction but attempted suicide to escape capital punishment. Twice he admitted the killing of a policeman, once in his letter to his friend and in a conversation with his Virginia cellmate. Such killing obviously related to the murder here involved. The circumstantial evidence was amply sufficient in quality and quantity to overcome the presumption of innocence and to carry the case to the jury.

The final reason assigned by defendant for a new trial was the alleged prejudicial effect on the jury of the trial judge's answer to a question propounded by them.

The record discloses the following statement made to the jury by the trial judge in the presence of all parties: "Members of the jury, you have written me a note wherein you asked a question. The question reads: 'Does life imprisonment permit any stipulation as to parole?' The answer to that question, members of the jury, is as follows: You may render any verdict you desire, and make whatever recommendations you wish, but I must inform you that any recommendations you may make are not binding." Defendant relies upon our decision in *Commonwealth v. Mills*, 350 Pa. 478, 39 A. 2d 572.

In *Commonwealth v. Mills,* supra, the situation is easily distinguishable from the facts in this case. There the question and answer were: " 'Will you please give us the definition of life imprisonment and the penalty. Is the prisoner eligible for parole at any time?'

"The court replied as follows:

" 'When a prisoner is sentenced to life imprisonment, he is not eligible to be paroled. He may, however, apply to the Pardon Board for a commutation of his sentence. We have, in Pennsylvania, a State Parole Board, which has jurisdiction in all cases except where the penalty is death or life imprisonment, and we also have a Pardon Board, and the Pardon Board is comprised of the Lieutenant Governor of Pennsylvania, the Secretary of the Commonwealth, the Attorney-General and the Secretary of Internal Affairs. Any prisoner, regardless of what the sentence is, may make application to the Board of Pardons for a commutation of his sentence, and the Board may then make its recommendation to the Governor for a reduction of sentence or, if the circumstances, in the opinion of the Pardon Board, warrant, they may recommend a full and complete pardon.' "

This Court decided that this answer was prejudicial to defendant. We said (p. 487), speaking through Chief Justice MAXEY: "Both the inquiry and the answer were irregular and neither should have been made. The only issue before the jury was that of the guilt of the defendant. Whether if found guilty and sentenced he was then eligible for parole was of no concern to the jury and the trial judge should have said so. The answer of the trial judge was well calculated to lead the jury to believe that if it resolved a reasonable doubt of defendant's guilt against him the Board of Pardons would make a timely correction of its error. Most of our citizens probably are aware that there is a Board of Pardons in this Commonwealth, but it is no part of a

trial judge's duty to instruct jurors on that subject. Such instructions as those now complained of constitute an implied invitation to the jury to transfer to the Board of Pardons an unpleasant responsibility which it is the jury's sworn duty to discharge."

In the present case the trial judge did not undertake to advise the jury as to pardon or commutation of sentence. All that he told the jury was that it could make any recommendations it desired, but that any such recommendations would not be binding. Perhaps it might have been wiser for the trial judge to have answered, as we subsequently said in *Commonwealth v. Johnson*, 368 Pa. 139, 81 A. 2d 569: ". . . whether the defendant might at any future time be pardoned or have his sentence commuted is no concern of theirs . . . ." However, our construction of the present answer is its substantial equivalent.

Judgment and sentence affirmed.