Commonwealth *v.* Johnson, Appellant.

Argued April 10, 1950; reargued January 2, 1951.
Before DREW, C. J., STERN, STEARNE, JONES, BELL,
LADNER and CHIDSEY, JJ.

*H. Lester Haws,* with him *Robert Wayne Honey-
man,* for appellant.

*Bernard E. DiJoseph,* with him *Roger B. Reynolds,*
Assistant District Attorneys and *J. Stroud Weber,* Dis-
trict Attorney, for appellee.

OPINION BY MR. JUSTICE HORACE STERN, June 27,
1951:

James Morris Johnson, tried by a jury, was found
guilty of murder in the first degree with penalty of

death. His motion for a new trial was overruled and he now appeals from the judgment and sentence imposed upon the verdict.

A Reading Railroad passenger train travelling from Allentown to Philadelphia was derailed on the night of May 9, 1948 near Valley Forge Station in Montgomery County. The engineer and fireman were killed. An investigation disclosed that a section of the track had been tampered with and a number of spikes and tie plates removed from the rail; the window of a railroad tool-house about a mile distant from the scene of the wreck had been broken into and a wrench and a crow bar were missing.

Suspicion was directed toward defendant because he had been convicted in 1940 in Delaware of the crime of "obstructing a railroad", that is to say, of attempting to wreck a train; he had been sentenced there to a term of ten years in prison but released after serving seven years. In November, 1948 he happened to be in custody in South Carolina for some traffic violation; Pennsylvania police authorities were sent to that State and defendant voluntarily returned with them. The day after his arrival here he made an oral confession of guilt to the officers and later a similar confession in the office of the district attorney, where his answers to questions propounded to him were taken down stenographically and he signed each page of the transcribed statement. The following day he was taken to the scene of the derailment where he was posed for photographs showing him, in one, pointing to the section of the track which had been removed and, in another, pointing to the window of the tool-house through which forced entry had been made. Upon his return to the district attorney's office he was again interrogated; the questions and answers were stenographically recorded and transcribed and he signed this statement also. Two days later he was given a hearing before a

magistrate on charges of wilful and malicious injury to railroads and murder.

Appellant appeals on several grounds:—(1) that his confessions were not obtained in accordance with due process of law and were therefore invalid; (2) that the trial court erred in admitting in evidence his prior conviction in Delaware; (3) that the court erred in instructing the jury that their verdict must be either murder in the first degree or not guilty; (4) that the court erred in admitting in evidence the photographs taken of him at the scene of the wreck; (5) that the court erred in the manner in which it answered the jury's inquiry as to the possibility of his being pardoned while serving a sentence of life imprisonment.

(1) Defendant does not deny that his return to Pennsylvania with the police officers was voluntary on his part; he merely testified that his motive was to escape punishment in South Carolina on the charge there pending against him. Neither does he claim that his confessions were not voluntary; he merely testified that they were not true. The confessions were made, one the day after, the other the second day after, his return. He knew he was being questioned by officers of the law and he was informed, before he made either statement, that what he said could be used against him. He does not claim that there was any intimidation, compulsion, threat, inducement or promise of any kind which would stamp them as having been improperly obtained. There was no interrogation so protracted or prolonged as to amount to mental or physical coercion or duress. The court did, however, submit to the jury the question whether the confessions were the voluntary acts of defendant and instructed them that they should consider whether there was any corroborating evidence confirmatory of their truth. Defendant was given a hearing before a magis-

trate on the fourth day after his return to Pennsylvania; such a delay cannot be adjudged a denial of due process.

(2) There is no merit in defendant's contention that the record of his former conviction should not have been admitted in evidence. Following the passage of the Act of May 14, 1925, P.L. 759, which imposed upon the jury the duty to determine whether the penalty for the crime of first degree murder should be life imprisonment or death it was established by many decisions in this Commonwealth that it is proper to furnish the jury with the same information a judge would consider when deciding what sentence should be imposed; such information necessarily includes the record of crimes previously committed by the defendant. The court carefully charged the jury that such evidence was admitted, not for consideration by them on the question of guilt, but only to assist them in their determination of the proper sentence if they should find defendant guilty of murder.

(3) Defendant was indicted under section 919 of The Penal Code of June 24, 1939, P. L. 872, which provides that whoever wilfully and maliciously removes or displaces any rail of a railroad, or attempts to derail any engine or car of a railroad, is guilty of a felony, and in every case where the life of a human being is destroyed by, or as a result of, any such acts the offender "shall be deemed guilty of murder in the first degree". Apparently giving consideration only to this and to no other section of the Code the court charged the jury that "there is but one of two verdicts that you may render. You may say that defendant is guilty of murder in the first degree or he is not guilty of anything, and in that case under the law your verdict should be not guilty. In other words, this defendant is either guilty of murder in the first degree or you should declare him not guilty by your verdict."

This charge of the court was erroneous. It is pointed out, in an attempt to support.it, that section 919 of the Code stems from the Act of May 26, 1891, P.L. 121, which provided that any one convicted of wilful and malicious removal of any rail on any railroad whereby the life of any human being was destroyed should be deemed guilty of murder; by the Act of June 1, 1911, P.L. 553, it was provided that in such cases the offender should be deemed guilty. of murder in the first degree and upon conviction. thereof should suffer death; the only change made in section 919 of the Code was the omission of the penalty provision. It is therefore contended that the history of this legislation shows that it was intended thereby to constitute homicide resulting from the derailment of a train as a particular or special type of murder which, unlike all other kinds of murder, cannot be found by either a court or a jury to be murder other than of the first degree. But what difference is there between the making of such offense a distinct kind of murder which constitutes murder in the first degree and the making of a homicide which occurs in the perpetration of any arson, rape, robbery, burglary or kidnapping a distinct kind of murder which constitutes murder in the first degree, as provided in section 701 of the Code? In the latter case we have held from the earliest times, even under the Act of April 22, 1794, 3 Sm. L. 186, section 2, that the phrase "shall be deemed murder of the first degree" did not take from the jury the right to render a verdict of murder in the second degree, and all juries have been so charged in this Commonwealth for more than 150 years. It is true that it is. section 701 which contains the added provision that "The jury before whom any person indicted for murder shall be tried, shall, if they find such person guilty thereof, ascertain in their verdict whether the person is guilty of murder of the first or second degree," but it will be noted that

the right thus given to the jury to determine the degree of the murder is not confined to the kinds of murder dealt with in that section alone but applies generally to the case of *"any person indicted for murder"*; this provision, therefore, is applicable to indictments for murder brought under section 919 of the Code as well as to those brought under section 701. Indeed, if the provisions of section 701 were not to be read inferentially into section 919 there would be no penalty whatever provided for the type of murder dealt with in the latter section since it is only in section 701 that the penalty for murder is prescribed. The Code is a comprehensive enactment of the criminal law; its sections are necessarily interrelated and it must be read and construed as an entirety. The court erred, therefore, in charging the jury that if they found defendant guilty their verdict had to be one of murder in the first degree.

(4) Ordinarily the introduction of photographs into evidence is a matter for the discretion of the trial court but heretofore they have been confined to pictures of the scene of the crime, the weapons used to commit it, the body of the victim, etc.; it would have been proper, therefore, in the present case to present photographs showing the condition of the tool-house window and the position of the rail where the tampering had occurred. The photographs here in question, however, were photographs for which defendant had been made to pose at the instance of the police; he was made to play the part of an actor in order to furnish illustrations to accompany his confessions. It is easy to see how the manufacture and use of such photographs might well lead to great abuses; indeed it would be but a step below the staging of motion pictures of a defendant re-enacting his alleged commission of the crime. Such photographs would be likely to impress a jury to such an extent as virtually to preclude the possibility of an acquittal, however otherwise reasonably

justified, because the vividness of their appeal to the eye might well give them greater significance than that to which their evidential value really entitled them. When they were objected to by defendant's counsel they should have been excluded.

(5)   After the jury had been deliberating for some twenty minutes they returned to the court room to receive instructions from the trial judge in answer to a note which they had transmitted to him reading as follows:—"What does the sentence life imprisonment mean? Does it mean what it infers or is there the possibility of a pardon after serving part of his time?" The court thereupon stated to the jury that "life imprisonment means what it says. . . . However, the Board of Pardons of the State of Pennsylvania, constituted under the law, has a right to intervene at any time. That is something that we cannot control. It is a separate and distinct organization from the court and in it is vested the power to pardon any of those who are convicted and sentenced by the court. . . . I have no means of knowing, and cannot control, what the Board of Pardons may do. As far as the sentence of life imprisonment is concerned, it means that, subject to whatever the Board of Pardons may do in the years that are to come. . . . I add to what I have already stated that the Board of Pardons has a right to commute a sentence. Instead of granting a full and complete pardon they can commute the sentence to a certain number of years. That is within their power." The jury retired, returned two hours later, and announced their verdict as guilty of first degree murder with the penalty of death.

It is obvious that the jury hesitated at fixing the penalty at life imprisonment because they feared that the defendant might be pardoned at some future time by the Board of Pardons, and when the court told them that that might happen and was something beyond the

control of the court they decided, after further deliberation, upon the penalty of death. The statement made by the learned trial judge, although true, of course, in fact, was highly prejudicial to the defendant. It was the jury's duty to impose the penalty which they thought appropriate in view of the nature of the crime and the character of the defendant as revealed by his previous record and their impressions of him at the trial, and they had no right, apart from such relevant considerations, to speculate as to whether the Board of Pardons might at a future time, wisely or unwisely, exercise some form of clemency. In *Commonwealth v. Earnest,* 342 Pa. 544, 551, 21 A. 2d 38, 41, Mr. Justice (later Chief Justice) MAXEY said: "Appellant's chief complaint as to the address [of the district attorney] is that the district attorney argued to the jury in effect that if a life sentence was imposed instead of the death penalty, some future Board of Pardons might release the convict 'in 5 years, 10 years, 20 years, . . . it can always let them out and it does'. . . . Such an argument is improper and is out of place in an address by a district attorney." If the thought when thus conveyed to the jury by the district attorney was "improper and out of place" it would certainly be all the more objectionable when conveyed to the jury by the trial judge even though by way of a response to their express inquiry. In *Commonwealth v. Mills,* 350 Pa. 478, 487, 39 A. 2d 572, 576, Chief Justice MAXEY said in regard to a question by the jury and answer by the court somewhat similar to those in the present case: "Both the inquiry and the answer were irregular and neither should have been made. . . . Whether if found guilty and sentenced he [the defendant] was then eligible for parole was of no concern to the jury and the trial judge should have said so." The duty of the jury in such cases is to determine the penalty without recourse to conjecture as to any possible or probable action of

the Board of Pardons at some later time. It seems to be quite common for juries in murder cases to make inquiries of this nature, and the reply of the court thereto should be, in substance, that whether the defendant might at any future time be pardoned or have his sentence commuted is no concern of theirs and should not enter in any manner whatsoever into their consideration of the proper penalty to be imposed, which should be determined solely in the light of the relevant facts and circumstances as they then existed.

The judgment and sentence are reversed and a new trial is awarded.

---

CONCURRING OPINION BY MR. JUSTICE JONES:

I fully agree with everything my brother STERN has so well said in the opinion for the court, but I also think that it is extremely doubtful whether the so-called confessions measure up to the required standards of due process when the evidence as to their history and the circumstances attending their formulation and execution is viewed with complete objectivity. The books will be searched in vain for a more startling example of a synthetically constructed case of murder against a suspect. As a retrial is being ordered, it is unnecessary now to review the evidence concerning the confessions. It is not inappropriate to note at this time, however, that this is but another instance of a capital conviction where there is not a *single* word of evidence to connect the accused with the crime except his own alleged confessions which he has since repudiated. In my opinion, the so-called confessions will be subjected to searching judicial scrutiny before any judgment of conviction is ultimately permitted to rest upon them.

CONCURRING AND DISSENTING OPINION BY MR. JUS-
TICE CHIDSEY:

I am in accord with the reversal of the judgment of
the court below and award of a new trial but solely for
the reason that the instructions given in response to
the jury's request concerning the powers of the Board
of Pardons constituted prejudicial and reversible er-
ror: *Commonwealth v. Mills*, 350 Pa. 478, 39 A. 2d 572.
I disagree with the holding by the majority that the
lower court erred in instructing the jury that their
verdict must be either murder in the first degree or not
guilty, and in admitting into evidence the photographs
taken of defendant at the scene of the crime.

1. The indictments upon which appellant was
tried were carefully drawn and specifically charged
him with the crime of murder in the perpetration of
malicious obstruction of a railroad contrary to the
statute applicable thereto. Section 919 of The Penal
Code of 1939 provides that where one obstructs a rail-
road and death results therefrom the offender "shall be
deemed guilty of murder in the first degree."

There is no occasion at this time to review the
judicial reasoning pronounced in support of the early
holdings of this Court that the Legislature gave to the
jury the power and duty to determine whether murder
committed in the perpetration or attempt to perpetrate
arson, rape, robbery or burglary was murder of the
first or second degree. That interpretation has existed
since *White v. Commonwealth*, 6 Binney 179, and was
reaffirmed as recently as *Commonwealth v. Gibbs*, 366
Pa. 182, 76 A. 2d 608. During the interim many Legis-
latures have considered revisions of, and in fact have
revised, our Penal Code and no material change of
language with respect to the treatment of murder com-
mitted in the perpetration or attempt to perpetrate the
four felonies mentioned has been effected from the time
of the passage of the Act of April 22, 1794 to the enact-

ment of The Penal Code of 1939 excepting that the latter in Section 701 adds kidnapping to the four felonies named, as the result of the amendment to the Criminal Code of 1860, enacted May 22, 1923, P.L. 306. A construction placed upon a given statute by the courts which has not been changed or modified in any respect by succeeding Legislatures must be deemed to have been in accordance with the legislative intention as regards the meaning of the words. Statutory Construction Act of May 28, 1937, P.L. 1019, Section 51, 46 PS §551; *Commonwealth v. Schuler,* 157 Pa. Superior Ct. 442, 43 A. 2d 646; *Department of Highways of Commonwealth v. Pennsylvania Public Utility Commission,* 141 Pa. Superior Ct. 376, 14 A. 2d 611.

But where a general statute is enacted intended to cover all phases of a given subject, every section of the law must be so construed that each will be given effect: Statutory Construction Act, supra, 46 PS §563; *Kerns v. Kane,* 363 Pa. 276, 69 A. 2d 388; *Commonwealth v. Kline,* 294 Pa. 562, 144 A. 750; *Vonot v. Hudson Coal Co.,* 285 Pa. 385, 132 A. 347; *Commonwealth v. Stingel,* 156 Pa. Superior Ct. 359, 40 A. 2d 140; *Commonwealth v. Daly,* 147 Pa. Superior Ct. 545, 24 A. 2d 91; *Commonwealth v. Hubbs,* 137 Pa. Superior Ct. 229, 8 A. 2d 611. If it is possible so to construe various or separate sections, a construction based upon the hypothesis that some other result might have been intended must be rejected: *Commonwealth v. Sun Ray Drug Company,* 360 Pa. 230, 61 A. 2d 350; *Commonwealth v. Mack Bros. Motor Car Company,* 359 Pa. 636, 59 A. 2d 923; *Commonwealth ex rel. Cartwright v. Cartwright,* 350 Pa. 638, 40 A. 2d 30; *Pennsylvania Liquor Control Board v. Publicker Commercial Alcohol Company,* 347 Pa. 555, 32 A. 2d 914; *Commonwealth ex rel. Maurer v. Witkin,* 344 Pa. 191, 25 A. 2d 317; *Midvale Company v. Unemployment Compensation Board of Review,* 165 Pa. Superior Ct. 359, 67 A. 2d

380. Of particular importance in the construction of any given section of a law is the historical development of the law itself: *Martin Estate,* 365 Pa. 280, 74 A. 2d 120; *Commonwealth v. Mack Bros. Motor Car Company,* supra.

The Legislature, when it promulgated the Criminal Code of 1860, P.L. 382, *et seq.,* considered as separate crimes malicious injury to railroads (Section 142) and casting articles toward and upon railroad property (Section 143). The former was deemed a felony and the penalty attached thereto was a fine not exceeding $10,000 and imprisonment not exceeding ten years. The latter was a misdemeanor and the penalty therefor was a fine not exceeding $1,000 and imprisonment not exceeding three years. In 1891 the Legislature enacted the following statute, Act of May 26, 1891, P.L. 121: "An Act defining the offense of the taking of human life through the wilful and malicious wrecking of cars and locomotives upon railroads in this Commonwealth. Section 1. Be it enacted, *etc.,* That on and after the passage of this act, any one who shall be convicted of the wilful and malicious obstruction, removal or misplacing of any light, signal or rail on any railroad in this Commonwealth, whereby the life of any human being is destroyed, shall be deemed guilty of murder."

The Legislature, in 1911 (Act of June 1, 1911, P. L. 553) repealed Sections 142 and 143 of the Act of 1860, amended the Act of 1891, and enacted a new and complete statute combining the prior offenses and providing that "in every case where the life of a human being shall be destroyed by or as a result of any of the acts herein prohibited [obstruction of railroads], the offender shall be deemed *guilty* of murder in the first degree, and upon conviction thereof *shall suffer death."* (Emphasis supplied) A minor change, immaterial here, was made in the Act of 1911 by the Act of May 9, 1913, P.L. 186. When the Legislature revised

The Penal Code in 1939 it was faced with the Act of May 14, 1925, P.L. 759, which changed the punishment for first degree murder from death by hanging to death by electrocution or life imprisonment, whichever the jury or the court, depending upon the nature of the plea, should determine. The public policy of this Commonwealth now requires that the jury or the court in appropriate cases should determine the penalty attached to a conviction of first degree murder. Consistent with maintaining this public policy the Legislature, when it revised The Penal Code in 1939, P. L. 872, *et seq.*, provided merely that one found guilty of having maliciously obstructed a railroad and having caused the death of a human would be guilty of the crime of murder in the first degree. It was for the jury to determine whether the penalty should be death or life imprisonment.

There is in this history of Section 919 evidence of a clear legislative intention that the crime of murder in the first degree thus created should be a distinct and separate crime with the penalty of death or life imprisonment. Research has not disclosed, nor has counsel for either appellant or the Commonwealth referred us to any decision wherein this section of the law, with respect to the crime of murder in the first degree as defined therein was required to be considered with Section 701 of The Penal Code or its counterpart in antecedent legislation. It is a specific section creating a specific crime. It was for a violation of this specific crime that appellant was indicted, tried, and convicted. Had the jury returned a verdict of "guilty as charged" there can be no doubt that he would have been guilty of murder in the first degree. Of course, the court would have been required to instruct the jury further as regards its duty to determine the penalty. In *White v. Commonwealth,* supra, this Court stated, in discussing the general murder statute of 1794, that "It seems

taken for granted, that it would not always appear on the face of the indictment of what degree the murder was, because the jury are to ascertain the degree, by their verdict, or in the case of confession, the court are to ascertain it by examination of witnesses. *But if the indictments were so drawn as plainly to show that the murder was of the first or second degree, all that the jury need do, would be to find the prisoner guilty in manner and form as he stands indicted."* (Emphasis supplied) This early pronouncement of Chief Justice TILGHMAN is as appropriate today as it was in 1813. In the instant case the indictment clearly stated a charge of murder in the first degree. Appellant was indicted for causing death resulting from malicious obstruction of a railroad. Section 919 is the only applicable statutory provision, and the penalty provided for such violation of the law was that which must attach to the degree of the crime which the statute specifically designates—murder in the first degree—consequently death or life imprisonment.

Section 919 defines the crime and the degree of murder but provides no penalty. If there could be no reference to the general murder section for the penalty for first degree murder, there would be the anomalous situation of a crime described as murder in the first degree without a prescribed penalty. In construing a statute, the Legislature must be presumed not to have intended a result which is absurd, impossible of execution, unreasonable or anomalous and irrational: Statutory Construction Act, supra, 46 PS §552; *H. C. Frick Coke Company Appeal,* 352 Pa. 269, 42 A. 2d 532; *Driskel v. O'Connor,* 339 Pa. 556, 15 A. 2d 366; *Commonwealth v. Gill,* 166 Pa. Superior Ct. 223, 70 A. 2d 700; *Commonwealth v. Daly,* supra.

It does not follow that because there must be reference to Section 701 (the general murder provision) to fix the penalty for first degree murder resulting

from train wrecking, that such reference requires adoption of the portion of Section 701 empowering the jury to determine the degree of murder, that is the degree of guilt. Section 919 not only defines the crime of murder through train wrecking causing death but also fixes the degree of guilt. It provides that the offender "shall be deemed guilty of murder in the first degree." The words "shall be deemed" guilty mean *"is"* guilty: *Commonwealth v. Brue,* 284 Pa. 294, 131 A. 367. The clear meaning of the wording of this section, to which no ambiguity can attach, is that if the offense is proved against a defendant, he *is guilty* of the crime of murder in the first degree. In the absence of doubt or ambiguity, effect must be given to the plain meaning of the words that are used in the statute: *Commonwealth v. Sun Ray Drug Company,* supra; *Commonwealth v. Cohen,* 142 Pa. Superior Ct. 199, 15 A. 2d 730. Section 701 defines premeditated killing and killing committed in connection with the felonies named but refers to the jury the fixing of the degree of guilt. Section 919 on the other hand defines the crime and fixes the guilt.

The provision in Section 701 that the jury shall fix the degree of guilt of "any person indicted for murder" refers to all murder described in the section, namely, by means of poison, or lying in wait or by any other kind of wilful, deliberate and premeditated murder or which shall be committed in the perpetration or attempt to perpetrate the felonies named. The crime of death caused by train wrecking is not embraced therein. Section 701 and Section 919 must be read so as to give effect to each: Statutory Construction Act and authorities cited, supra.

It strains neither logic nor reason to conclude that the Legislature intended a more rigorous treatment of murder resulting from train wrecking. In adopting Section 919 it seems apparent that consideration must have been given to the fact that train wrecking exposes to

grave danger or death great numbers of the traveling public who daily entrust their lives to safe transportation by rail. As a matter of prudent policy it appears that the Legislature advisedly intended to make a convicted offender unequivocally guilty of murder in the first degree. Had the intention been otherwise, this crime could have been included in Section 701, the general murder provision, along with the other felonies of arson, rape, robbery, burglary and kidnapping where the offense is no less heinous, but the general public is not exposed en masse to the act of an evil doer. Significantly, kidnapping was added to the list of felonies in the general murder section by the Act of 1923, supra, and if the Legislature intended to put death resulting from train wrecking in the same category, it could readily have done so. I think the learned trial judge correctly charged the jury that if they found the defendant guilty, their verdict must be guilty of murder in the first degree.

2. Mr. Justice STERN in the opinion for the Court forcibly points out the danger of undue prejudice in the admission of posed photographs of the character here involved, stating that "the vividness of their appeal to the eye might well give them greater significance than that to which their evidential value really entitled them." But the same danger lies in the admission of any photograph which may with equal vividness portray some relevant fact in connection with the commission of the crime. This Court has repeatedly held that photographs of the victim's body, although gruesome and shocking, are admissible in evidence if helpful to the jury in their deliberation and not introduced solely to arouse their emotions: *Commonwealth v. Gibbs,* 366 Pa. 182, 76 A. 2d 608, and cases cited therein.

In Wigmore on Evidence, Third Edition, Vol. 6, Sec. 1864(b), the rule is stated that ". . . if certain evi-

dential material, having a legitimate probative value, tends nevertheless to produce also, over and above its legitimate effect, an unfair prejudice to the opponent, . . . there is good ground for excluding such evidence, unless it is indispensable for its legitimate purpose." This in effect means that the danger of undue prejudice must be balanced against the risk of failing to reach a just result. In such consideration I can see no difference between posed photographs and photographs in general. All photographs depicting relevant facts have legitimate probative value and while posed photographs may possess a higher degree of effectiveness, the question still remains whether their tendency to create unfair prejudice to the defendant outweighs the probative value and legitimate effect of their admission. As necessarily implied in the quoted rule, this is something that must be determined by the trial judge who should enjoy a large measure of discretion in the matter. His action should depend upon the character of the photographs, and those which depict the reenactment of elements of the crime by the defendant, like confessions, should be admitted into evidence only if the reenactment was voluntary on his part.

In the present case the defendant voluntarily permitted the photographs in question to be taken. In the one he was pointing to the rail which he had displaced and in the other to a window in the tool shed which he had entered and obtained a wrench and crowbar. This confirmed his voluntary confessions and corroborated the antecedent testimony of the Commonwealth's witnesses. See *Commonwealth v. Wentzel*, 360 Pa. 137, 61 A. 2d 309. The photographs certainly were not inflammatory.

A holding that their admission into evidence was error can only be justified by a hard and fast rule that posed photographs of this type are inadmissible in any and all circumstances. The adoption of such a

rule is, in my opinion, unwise. We are not confronted with a question of abridgment of any constitutional right of a defendant, in which case the court must draw clearly defined lines. Conceivably cases may arise where the admission of such photographs is indispensable to the securing of a just result. I think their receipt into evidence should in all cases lie within the sound discretion of the trial judge, and I find no abuse of discretion in their admission here. In its war against the criminal surrounded by constitutional safeguards liberally construed by the highest court in the land, society should not be hampered by a mandate prohibiting the use of evidence of legitimate probative value on the theory that it is too realistic.

Mr. Chief Justice DREW and Mr. Justice LADNER join in this concurring and dissenting opinion.