## School Accidents

MORRIS J. DEAN, Deputy Attorney General, and ANNE X. ALPERN, Attorney General, April 29, 1960.— You have asked our advice as to whether a school board may purchase insurance for school athletic accidents

without providing coverage therein for the claims of chiropodists [1] which arise out of the treatment of foot injuries incurred in such accidents.

The propriety of this practice must be measured against the statutory provision under which school boards derive their authority to enter into athletic accident insurance contracts. Section 511(f) of the Public School Code of March 10, 1949, P. L. 30, as amended by the Act of April 26, 1949, P. L. 726, 24 PS §5-511(f), reads in relevant part:

"The board of school directors of any district is hereby authorized to appropriate any monies of the district for the payment of *medical* and hospital *expenses* incurred as a result of participation in such athletic events or games, practice or preparation therefor, or in transportation to or from such athletic events or games, or the practice or preparation therefor, and for the purchase of accident insurance in connection with such participation and transportation." (Italics supplied.)

In light of the language which would permit a board to appropriate money for "medical expenses", an actual appropriation for such purpose raises two issues:

1. Does the term "medical expenses" encompass expenses for the services of a chiropodist?

2. If it does, may a school board limit an appropriation under this provision to payment for the services of selected types of medical practitioners rather than of all practitioners whose services result in "medical expenses" within the meaning of this provision?

---

[1] "(A) 'Chiropody' shall mean the diagnosis of foot ailments and the practice of minor surgery upon the feet, the padding, dressing and strapping of the feet, the making of models of the feet and palliative and mechanical treatment of functional disturbances of feet not including the amputation of the leg, foot or toes or the treatment of systemic diseases of the bones, ligaments or muscles of the feet, or any part of the body": Chiropody Act of March 2, 1956, P. L. 1206, 63 PS §42.2.

Section 511 (*f*) contains no definition of the term "medical," and of itself provides no clue as to whether the term "medical expenses" encompasses expenses for the services of a chiropodist.[2]

Where there have been similar definitional omissions in statute or contracts, the courts have followed the general rule of construction set forth in Palmer v. O'Hara, 359 Pa. 213, 58 A. 2d 574 (1948). In that case, the Supreme Court of Pennsylvania was asked to determine whether the practice of osteopathy was included in the term "qualified physician" under The Mental Health Act of July 11, 1923, P. L. 998.

To establish that it was, the osteopaths pointed to the 1941 amendment to the Medical Practice Act of June 3, 1911, P. L. 639, which enlarged the scope of "medical practice" so as, apparently, to encompass the practice of osteopathy. The court dismissed this argument, saying, on page 222:

". . . Even if it should be held that, under the 1941 amendment, 'osteopathy' is now a branch of 'medicine', the crucial question would remain as to who were 'licensed to practice medicine' *upon the passage* of the Mental Health Act in 1928. And, the inescapable answer is that osteopaths were not so licensed, no more than were dentists or pharmacists whose licensure and regulation, just as in the case of the osteopaths, is by virtue of respective independent statutes and not by

---

[2] This statute contrasts sharply with the type of statute exemplified by section 213 (*e*) of the Internal Revenue Code of August 16, 1954, 68A Stat. 69, as amended, 26 U. S. C. §213 (*e*). By the express terms of such provision, the expenses for a chiropodist's treatment would qualify as a medical expense deductible for Federal income tax purposes. It reads: "(1) The term 'medical care' means amounts paid—

"(A) for the diagnosis, cure, mitigation, treatment or prevention of disease, or for the purpose of affecting any structure or function of the body . . .".

the *determinative* Medical Practice Act." (Italics supplied.)

This case therefore stands as authority for the proposition that the meaning of "physican" or "medical" in a particular statute is to be determined by reference to the scope of the Medical Practice Act in the year of passage of such statute.[3]

Applying this principle here, it is clear that the issue of whether a chiropodist's services are encompassed within the term "medical expenses" in a Public School Code provision enacted in 1949 turns on whether at that time the practice of chiropody was embraced within the scope of the Medical Practice Act.

We need refer for the answer only to the regulations of the medical board which were effective in the year 1949. These clearly show that chiropody was a recognized branch of "medicine" and that those who sought to practice it were required to be licensed by the "Medical" board. Indeed, it was not until the Chiropody Act of 1956, 63 PS §42.1 et seq., that chiropodists were removed from the jurisdiction of the Board of Medical Education and Licensure and placed under the control of a newly created State Board of Chiropody Examiners.[4]

---

[3] Cf. Kahn v. Metropolitan Life Ins. Co., 132 N. J. L. 503, 41 A. 2d 329 (1945). In this case, the question before the court was whether an insured in violation of the terms of his application has failed to give complete information concerning "medical treatments" when he failed to note his treatment by a chiropractor. The court found chiropractic teratment to be "medical" in nature on the theory that during the years in question "the subject of chiropractic [had] been dealt with by the Legislature" under the general Medical Practice Act. See also State ex rel. Board of Medical Registration and Examination v. Hayes, 228 Ind. 286, 91 N. E. 2d 913 (1950).

[4]. It is interesting to note that under the Chiropody Act the standards of preliminary and professional education to be met by prospective licensees are substantially higher than they were under the Medical Practice Act.

Accordingly, it is our view that the term "medical expenses" in section 511 (*f*) of the Public School Code of 1949 encompasses expenses for the services of a chiropodist.

There remains the further question of limiting an appropriation under this provision to payment for the services of selected types of medical practitioners.

It must be conceded that a school board is under no obligation to make any appropriation of moneys for school athletic injuries; the statute merely "authorizes" such action. Even if the money is appropriated, there is nothing to prevent a school board from omitting insurance coverage for various types of physical injuries. Controversy only arises where a school board would desire to exclude not a class of injuries from the coverage of its insurance, but to exclude a class of "medical" practitioners whose scope of practice legitimately encompasses the insured physical injuries.

This department is convinced that in using the term "medical expenses" in connection with empowering school boards to appropriate moneys for such purposes, the legislature did not intend that practitioners whose costs result in medical expense should be accorded dissimilar treatment. An intention to permit discrimination among legitimate "medical practitioners" should not lightly be imputed to the legislature. It is well established that the powers of school boards are limited to those which the legislature has expressly granted to them.[5]

This conclusion is reinforced by the analogous way in which the courts have treated various exclusionary or discriminatory policies of public hospitals in the use of their facilities by medical practitioners. In dealing with such restrictive or exclusionary policies,

---

[5] Slippery Rock Area Joint School System v. Franklin Township School District, 389 Pa. 435, 133 A. 2d 848 (1957).

the courts have applied the principle that such policies may not be "unreasonable, arbitrary, capricious or discriminatory".[6] This position is based upon the fear of the courts that, without a rule of reason, patients would be deprived of their free choice of a physician, and certain physicians would to that extent be deprived of the right to practice their profession.

This judicial attitude against the unreasonable deprivation of the patient's freedom of choice of physician recognizes the evil of forcing the patient to take his treatment at the hands of physicians "who would not be familiar with [his] case" and "in whom the patient may lack confidence".[7] It also acknowledges that permitting the unreasonable deprivation or denial of access by physicians to public hospitals might produce widespread harm to the practice of many duly licensed physicians.

The conclusion of the court in Alpert v. Board of Governors of City Hospital, 286 App. Div. 542, 145 N. Y. S. 2d 534 (4th Dept. 1955), summarizes the judicial protection now accorded physicians and their patients against the regulatory bodies of public hospitals:[8]

"Nevertheless, the respondent [the Hospital] has unreasonably and arbitrarily excluded him [physician] from the use of the hospital, relying upon the lack of any relevant express limitations upon its authority. We conclude that additional limitations are to be implied, partly because of the very nature of a public hospital, and partly to furnish constitutional protection to valuable interests."

---

[6] Findlay v. Board of Supervisors of County of Mohave, 72 Ariz. 58, 230 P. 2d 526 (1951).

[7] Wyatt v. Tahoe Forest Hospital District, 345 P. 2d 93 (Cal. 1959).

[8] Accord: Findlay v. Board of Supervisors of County of Mohave, supra; Wyatt v. Tahoe Forest Hospital District, supra.

Such a rule of reason is in order in this case. Even as a selective or exclusionary policy of a public hospital is directed against certain physicians, a public school reimbursement program which discriminates against certain "medical" practitioners strikes at the traditionally direct and consensual relationship between patient and practitioner. The power of a school board to select certain practitioners for reimbursement of athletic injuries is also the power to limit the public's choice of practitioner and, in the process, to injure the practice of unfavored practitioners. Logic dictates that the same rationale which guides the regulatory bodies of public hospitals in their treatment of physicians should also be applicable to the relationship between school boards and medical practitioners in connection with an athletic injury reimbursement program.

Therefore, if a school board chooses to make an appropriation to pay medical expenses, under section 511($f$) of the Public School Code, it cannot, without acting arbitrarily, preclude the reimbursement of any medical practitioner who is empowered by law to treat the "covered" physical injuries and whose services result in medical expenses within the meaning of the provision in question. Thus, a school board could not refuse to pay a chiropodist for the same type of treatment for which it would pay if the services were performed by other medical practitioners.

It follows, of course, that any insurance obtained with such an appropriation would have to have coverage for chiropodists as well as other medical practitioners.

It is therefore our opinion, and you are accordingly advised, that if a school board chooses to purchase insurance for school athletic accidents which includes coverage for foot injuries, it may not exclude from coverage claims of chiropodists which arise out of the treatment of such foot injuries.